Filed 1/4/24  P. v. Smith CA2/4

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. DONALD FRANKLIN SMITH, Defendant and Appellant. | B321024 Los Angeles County Super. Ct. No. A711739 |

APPEAL from an order of the Superior Court of Los Angeles County, Henry J. Hall, Judge. Affirmed.

John Steinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Dana Muhammad Ali and Colleen M. Tiedemann, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

In 1995, a jury convicted defendant and appellant Donald Franklin Smith of two counts of first degree murder, two counts of second degree murder, and one count of attempted murder. After a penalty trial, the jury returned a verdict of death.

In 2020, Smith filed a petition for resentencing under former Penal Code section 1170.95.[1] The trial court issued an order to show cause on the second degree murder and attempted murder counts, then, following an evidentiary hearing, granted Smith relief on those counts. The court subsequently vacated the death sentence, and resentenced Smith to consecutive terms of life without the possibility of parole on the first degree murder counts.

On appeal, Smith argues because the jury was instructed on the natural and probable consequences doctrine, the trial court erred by denying his petition on the first degree murder convictions at the prima facie stage. He further argues he is entitled to an evidentiary hearing on one of those counts. We disagree. The trial court properly denied relief on those counts at the prima facie stage because the record demonstrates they were not based on the natural and probable consequences doctrine, but rather on the theory that Smith harbored the intent to kill. We therefore affirm the trial court's order denying relief on the first degree murder counts.

---

1    All undesignated statutory references are to the Penal Code. Effective June 30, 2022, the Legislature renumbered section 1170.95 to section 1172.6. (Stats. 2022, ch. 58, § 10.) There were no substantive changes to the statute.

## PROCEDURAL BACKGROUND[2]

In 1995, a jury convicted Smith of the first degree murders of Andre Armstrong and James Brown (counts three and four), the second degree murders of Loretha Anderson and Chemise English (counts one and two), and the attempted murder of Carlos English (count five). (§§ 187, subd. (a), 664.) The jury found true the special circumstance allegation that Smith committed multiple murders and at least one of the murders was in the first degree. (§ 190.2, subd. (a)(3).) Following a penalty phase trial, the trial court sentenced Smith to death. The Supreme Court affirmed the judgments of Smith and his codefendants in *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335 (*Bryant, Smith, and Wheeler*).

In 2020, Smith filed a resentencing petition under former section 1170.95. In February 2022, the trial court held an evidentiary hearing, then issued a written order granting relief on the second degree murder and attempted murder counts. The court vacated the convictions on those counts, but denied relief on the first degree murder counts.

In March 2022, the trial court vacated the death sentence and scheduled a resentencing hearing. Then, in April 2022, the court sentenced Smith to consecutive terms of life without the possibility of parole on those counts.

Smith timely appealed.

---

2      We granted Smith's request for judicial notice of the record of his jury trial. That record was prepared as part of Smith's automatic appeal in California Supreme Court case number S049596.

3

## FACTUAL BACKGROUND[3]

"The presentation of guilt phase evidence lasted two and one-half months. It included the testimony of 121 witnesses and more than 270 exhibits including hundreds of pages of documents and a number of video and audio tapes. In the penalty phase, 41 witnesses testified over the course of seven days. We present here for background purposes a synopsis of the significant evidence, generally viewed in the light most favorable to the verdicts. Additional factual and procedural details necessary to resolve defendants' appellate claims are provided in the pertinent discussion.

"A. *Guilt Phase*

"1. *Overview*

"The original charges included a number of noncapital offenses with additional defendants involved in the Bryant Family drug operation. The court severed and tried the capital allegations first. The prosecution's basic theory was that Bryant directed the shootings of Armstrong and Brown because Armstrong was a threat to Bryant's business. The prosecution maintained that Smith, Wheeler, and codefendant Settle were underlings who participated in the murders at Bryant's direction. After Armstrong and Brown were killed, the prosecution asserted, Wheeler shot Ms. Anderson and Chemise and

_____

3    The following facts are taken from the Supreme Court's decision resolving Smith's direct appeal in *Bryant, Smith, and Wheeler, supra*, 60 Cal.4th 335. We include this information solely to provide background and context for the parties' arguments, and do not rely on it to resolve this appeal. (See *People v. Delgadillo* (2022) 14 Cal.5th 216, 222, fn. 2.)

attempted to murder Carlos to eliminate them as potential witnesses.

"Smith presented no evidence at the guilt phase. Wheeler testified and admitted some low-level activity in the drug business, but claimed he was not involved in the murders. Bryant also admitted he was a member of the organization. He asserted his role was less significant than the prosecution alleged, and that he had no role in the murders.

### "2. Prosecution Evidence

"In the 1980's, Bryant and his older brother Jeff Bryant (Jeff) controlled a large-scale cocaine operation in the suburbs of Los Angeles. Their organization was known as 'the Family' or 'the Bryant Family' and had over 100 employees. A number of these testified at trial about Family operations. Seized records indicated the Family took in well over $1 million during three months of 1988.

"The Family used a number of houses to prepare and sell drugs and process the money from sales. Typically, the houses were fortified. Windows and doors were covered and locked, [and] metal gates with electronic locks and blackout screens were erected at front entrances to create 'sally ports.' Someone entering the house would be enclosed between two locked gates and unable to see farther into the residence. Barricaded or reinforced locked doors inside blocked access between rooms.

"These fortifications were encountered during interdiction operations in 1984 and 1985. Ultimately, police served search warrants at several Family houses. Service of the warrants required the use of various entry tactics. Sometimes a vehicle resembling a military tank would break a hole in an exterior wall so officers could enter. As a result of these investigations, Jeff

pleaded guilty to charges of selling cocaine and operating a house where narcotics were sold. Defendant Bryant pleaded guilty to conspiracy. He admitted hiring a coconspirator to sell cocaine at a Bryant Family 'rock house' on Wheeler Avenue, the same house where the murders later occurred (hereinafter sometimes referred to as Wheeler Avenue). Apparently, these events were only a minor setback; widespread operations continued. When Bryant was released from custody, he ran the street enterprise. Although Jeff remained imprisoned, he was still considered the overall Family leader. Houses damaged during police raids were repaired, refortified, and returned to service.

"The Family also engaged in ancillary violent activities. As relevant here, in 1982, Bryant and Jeff hired Andre Armstrong to act as a 'hit man.' Armstrong subsequently shot Reynard Goldman for failing to pay a $50 drug debt. He killed Kenneth Gentry, who had vandalized another Bryant brother's van. Bryant, Jeff, and Armstrong were charged with the Goldman assault and Gentry murder. After the Family bribed and threatened witnesses, charges against the Bryant brothers were dropped. Armstrong, however, was convicted at trial of felony assault and first degree murder. When his convictions were reversed on appeal, he pleaded guilty to felony assault and voluntary manslaughter. He was paroled in July 1988.

"While Armstrong was in prison, Bryant and other Family employees sent thousands of dollars to him and his relatives. Several months before Armstrong was paroled, the Family helped his friend James Brown set up a cocaine operation in Monterey. Nonetheless, Armstrong remained unhappy with the level of support he had received. Weeks after meeting Brown in Monterey, Armstrong decided they should return to Los Angeles.

Armstrong told several people, including police officers who had interviewed him in prison, that he intended to 'squeeze' the Bryants for money and part of their business. He considered them weak, and felt they failed to honor their promise to prevent his conviction. While in Monterey, Armstrong began an intimate relationship with Bryant's ex-wife, Tannis Curry. These decisions proved ill advised.

"On Friday, August 26, 1988, Brown, Andrew Greer, Elaine Webb, and Loretha Anderson and her two children moved to Los Angeles. Armstrong and Tannis had gone there a few days earlier. Bryant had provided an apartment, but it was dirty. Armstrong wanted Bryant to pay for cleaning before they moved in. On Saturday, the group went to a pool hall to meet Bryant and complain about the accommodations. On Sunday, Armstrong, Brown, and Greer went to Tannis's separate apartment. Armstrong paged Bryant, then received a call. He told the others they were to meet 'Stan' at a Wheeler Avenue house to pick up $500 and cleaning supplies. Armstrong told Tannis to bring a pistol, which she placed in her purse.

"Before meeting Stan, the group went to the home of Tannis's aunt. When they left, Tannis remained behind. Greer was concerned about the meeting and did not attend. Anderson decided she and her children would go along to the meeting so they could all get something to eat afterwards.

"Several people near the Wheeler Avenue house heard multiple gunshots at approximately 5:00 p.m. Shortly thereafter, a tall, thin African-American man emerged, went to a car parked outside, and shot into the car. He then got in the car and drove away. One witness identified a photograph of defendant Wheeler

7

as the driver.[4] A witness also saw what might have been a car owned by Bryant leaving the house after the shooting. Another witness saw a large green car with a driver, front seat passenger, and two men in the backseat leaning against each other in an unusual way.

"Within minutes of the shootings, the victims' car was found about seven blocks away. Inside were the lifeless bodies of Loretha Anderson and Chemise English. Anderson had been shot several times with both a shotgun and a handgun. Chemise had been fatally shot in the neck by a handgun at close range. Carlos was also in the car. While not shot, he was injured by flying glass.

"Four days later the bodies of Armstrong and Brown were found in roadside brush approximately five miles from Wheeler Avenue. Armstrong had been shot twice with a shotgun. A shot to the center of his chest was probably fired from a distance of four feet or less. A second to his head was apparently fired with the shotgun muzzle almost touching his skin. He was also shot with a handgun. Brown was shot twice with a shotgun and twice in the chest with a handgun. The fatal shot was fired into his heart with the handgun muzzle pressed against him. Evidence at Wheeler Avenue, including blood patterns, bullet holes, and expended cartridges, indicated that Armstrong and Brown had been shot in the front entrance sally port. Their bodies were dragged through the house into the garage.

---

4        "Although the witness insisted that the photograph of Wheeler was of the driver of the victim's car, she repeatedly pointed to Bryant when asked if she saw the person in court. She had testified at the preliminary hearing that she had not been able to 'get a good i.d.' of the driver, and did not identify any defendant as the driver at those earlier proceedings."

"James Williams, a Bryant Family employee, was present at Wheeler Avenue before and during the crimes. He started working for the Family at the beginning of April 1988 and initially worked at Bryant's pool hall. His primary duty was to tell cocaine purchasers where to go to acquire drugs. Williams was quickly promoted to working at the Wheeler Avenue 'count house.' There, money from drug sales was counted and bundled. Family employees came to the house to pick up their weekly pay. People wishing to purchase larger quantities of cocaine would also arrange purchases at Wheeler Avenue.

"Williams, defendant Wheeler, and Lamont Gillon normally worked daily staggered eight-hour shifts at the count house. A fourth employee, Anthony Arceneaux, would fill in for the other three on their days off. Bryant, who was referred to as 'Chief,' regularly visited and gave Williams directions. Williams knew defendant Smith worked for the Family because he picked up his weekly pay at the house. Williams did not know Smith's role in the organization.

"On the day of the murders Williams was working when Bryant arrived around 2:00 p.m. At some point, Bryant had Williams contact Arceneaux and tell him not to come to work. Bryant moved money along with counting and adding machines, normally kept in the house, into the garage. He also carried a heavy duffle bag from the garage into a back bedroom. Later, Wheeler and Smith arrived and joined Bryant in the back room. It was unusual for Wheeler and Smith to be there on a Sunday afternoon. Bryant also remarked several times that 'Johnny' was late. Subsequently, codefendant Jon Settle, whom Williams had never seen at the house before, arrived and went into the back room also.

"Sometime later, Williams heard a gunshot from the rear of the house. Bryant emerged and asked how loud a noise the shot had made. Later, Settle came out, chambered a shotgun round, and returned to the bedroom. Eventually, Bryant, Smith, and Wheeler came to the front room. Bryant said they were expecting some people and told Williams what to do when they arrived. After they entered the sally port, Williams was to release the electronic lock on the outside door so Bryant could leave. When he had done so, Williams was to go out through the garage to a green car parked in the driveway and back it into the garage. He would then walk to a nearby bus stop, watching to see if any neighbors were looking.

"Eventually, Williams saw two strangers approach. After they entered the sally port, Williams unlocked the outer gate so Bryant could leave. As Williams walked back toward the garage, he heard gunshots and screams. While backing the green car inside, he saw Wheeler outside with a shotgun. Wheeler approached a car parked at the curb and Williams heard glass breaking. After parking the green car Williams saw Bryant in the garage. Bryant told him to leave. While walking to the bus stop, he saw Wheeler driving the car that had been parked in front of the house. Bryant drove away in his own car. Smith and Settle left in the green car. Bryant later called Williams and told him not to go back to the house and not to talk about what had happened.

"Several days later, a Family employee told Williams he had been identified. Williams was told to leave Los Angeles; the Family would cover his expenses. He went to Pennsylvania and received a $500 wire transfer from a Family employee.

Eventually arrested in Harrisburg, he gave several statements about the shootings in exchange for immunity.

"Bryant's and Wheeler's fingerprints were found in the Wheeler Avenue house. Bryant's prints were found on a portable telephone and on the page of an address book containing an entry for the alias victim James Brown was using. Expended cartridges from three different shotguns were found at the house. An expended .45-caliber casing was also found in a trash can. It had been fired from a handgun later recovered in Bryant's house.

"The day after the shootings, Bryant and Wheeler visited Jeff at Donovan State Prison.

"Six days after the murders, Bryant bought a new car using the name of a Family employee. He traded in his relatively new car, which matched the description of the one Williams said Bryant had driven to Wheeler Avenue. Examination of the trade-in yielded positive presumptive tests for the presence of blood at the driver's feet.

"Bryant told Ladell Player, a drug dealer supplied by the Family, that the police had been at Wheeler Avenue because 'we had some problems, but we took care of them.' Bryant also told Alonzo Smith that, in essence, Brown 'had to go.'

"On September 25, 1988, police officers searched the apartment of Wheeler's girlfriend, and found a handgun consistent with the one used to shoot Loretha Anderson and her daughter. They also recovered two newspaper articles related to the murders, and $ 7,650 in cash hidden in the ceiling.

"On September 29, 1988, police searched Bryant's house. They found numerous items related to Family business, the handgun that had fired the expended cartridge found at Wheeler

11

Avenue, several keys to that house, and papers with telephone numbers for James Brown and relatives of Andre Armstrong.

"Extensive telephone records suggested the following. Bryant and Smith talked to Armstrong or his relatives after he was released from prison. Before the murders Bryant and Smith exchanged numerous phone calls, Bryant and Wheeler called each other repeatedly, and each defendant made several calls to Wheeler Avenue.

"In an effort to establish an apparent additional motive for Bryant to murder Andre Armstrong, and to further tie Smith to the murders, the prosecution introduced evidence of two attacks on one Keith Curry. When attacked, Curry, like victim Andre Armstrong, had been involved in an intimate relationship with Bryant's ex-wife Tannis. He also was friendly with defendant Smith. The prosecution asserted that Bryant was jealous of Armstrong's affair. Because Smith and Armstrong were friends, Smith's presence at Wheeler Avenue was designed to place Armstrong at ease before the shooting.

"Curry testified that he began dating Tannis when her relationship with Bryant was unstable. Tannis moved into an apartment where Curry typically spent three or four nights a week. On the morning of March 16, 1986, Curry left the apartment and his car exploded. A bomb was triggered by the car's movement. Curry was slightly injured. Tannis told an acquaintance that Bryant said he put the bomb in Curry's car and 'would do it again . . . until [Curry] was dead.'

"Tannis divorced Bryant and married Curry. One evening Smith and Curry were engaged in small talk when Smith suddenly shot Curry in the neck, paralyzing him. Smith was arrested later that night and police found a revolver and what

12

appeared to be rock cocaine packaged for sale in his car. He was later released on bail after several properties connected to the Family were posted as security.

### "3. Wheeler's Evidence

"Wheeler testified he joined the Family in early 1988. He began selling drugs for Eddie Barber, who ran a semiautonomous 'crew.' Later, at Barber's direction, Wheeler started working at Wheeler Avenue. James Williams ran Wheeler Avenue, and served as an 'enforcer.'

"On the day of the murders, Wheeler completed his shift at 7:00 a.m. then spent the day with his girlfriend visiting their families in Los Angeles. At 3:00 that afternoon and again at 10:45 that evening, he received a page. In response, Wheeler called Williams who told him not to come to work.

"Eddie Barber had previously instructed Wheeler to visit Jeff in prison the next day to report about drug operations. Wheeler was unaware of the shootings until he heard about them from Bryant, who was also visiting Jeff. If Wheeler had been involved in the murders he would not have visited Jeff the next day because doing so would have connected Jeff to the murders. If he had been involved, he would have fled, using money he had saved from his drug dealing.

"All Wheeler knew about Bryant's role in the Family was he arranged bail when members were arrested. He had not met codefendant Jon Settle before court proceedings began.

"Wheeler's girlfriend testified that she did not specifically remember what she and Wheeler did on the day of the shootings; they customarily visited family on Sundays.

### "4. Smith's Evidence

"Smith offered no evidence at the guilt phase of the trial.

### "5. Bryant's Evidence

"Bryant testified. While admitting his involvement in the drug business, he denied or attempted to refute evidence connecting him to the murders. He claimed he worked for his brother until Jeff went to prison. Bryant then turned the drug business over to William Settle, who was running things when the murders occurred. William Settle was the brother of codefendant Jon Settle. Bryant was never in charge. William Settle paid Bryant for the use of his pool hall in connection with the drug business. Bryant also worked at Wheeler Avenue counting money. He 'probably' had been there every day in 1988. However, he was not there the day of the murders and never subsequently returned. He had never been there with Williams. Bryant's activities were all done at someone else's direction.

"Bryant did not arrange a meeting with Armstrong at Wheeler Avenue. He spent most of the day of the murders at home. He denied that he drove a car like the one seen leaving the house. He never spoke with Ladell Player about what had happened at the house. He visited Jeff in prison the day after the murders to get advice about how to end his association with William Settle.

"Bryant was uninvolved with the attacks on Kenneth Gentry, Reynard Goldman, and Keith Curry. He did not know Gentry, and did not hire Armstrong to kill him. After they were arrested for the Gentry murder, Armstrong told Bryant he shot Gentry because they had both been dating the same woman. Armstrong had decided to preemptively kill Gentry before Gentry

acted against him. Bryant had not threatened Reynard Goldman about any drug debt. He denied knowing anything about the attempts to bribe witnesses in the Gentry and Goldman shootings. He had nothing to do with the car bombing of Keith Curry, and never told Tannis that he wanted to kill him.

"Through the testimony of investigating officers, Bryant presented various inconsistencies between James Williams's statements to the police and his testimony at trial.

## "6. Codefendant Settle's Evidence

"Codefendant Settle testified and presented other evidence that he was an automobile mechanic and was only peripherally connected to the Family drug business through his brothers William and Frank. He did not participate in the murders, but did sell Bryant a green 1970 Pontiac Bonneville on the day of the shootings. According to Settle, defendant Wheeler drove Settle's brother Frank to pay for the Bonneville and to pick up another car Settle had repaired for Bryant. Frank later told Settle that the Bonneville had been used in the murders." (*Bryant, Smith, and Wheeler*, *supra*, 60 Cal.4th at pp. 352-360.)

## DISCUSSION

## I. Governing Law

The Legislature enacted Senate Bill 1437 (SB 1437) "to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f);

accord, § 189, subd. (e); *People v. Lewis* (2021) 11 Cal.5th 952, 959 (*Lewis*).) Senate Bill No. 775 (2021-2022 Reg. Sess.) (SB 775) expanded SB 1437 to include convictions for attempted murder under the natural and probable consequences doctrine. (Stats. 2021, ch. 551.)

SB 1437 also added section 1170.95 to the Penal Code which, as mentioned above, was later renumbered to section 1172.6. (Stats. 2018, ch. 1015, § 4; Stats. 2022, ch. 58, § 10.) This section permits individuals who were convicted of felony murder or murder under the natural and probable consequences doctrine, but who could not be convicted of murder following SB 1437's changes to sections 188 and 189, to petition the sentencing court to vacate the conviction and resentence on any remaining counts. (§ 1172.6, subd. (a).) It likewise permits individuals who were convicted of attempted murder under the natural and probable consequences doctrine, but who could not be convicted of attempted murder under current law, to petition the sentencing court for relief. (*Ibid.*) It also provides relief for certain individuals convicted of murder or attempted murder under any "other theory under which malice is imputed to a person based solely on that person's participation in a crime." (*Ibid.*)

A petition for relief under section 1172.6 must include a declaration by the petitioner that he or she is eligible for relief based on all the requirements of subdivision (a), the superior court case number and year of the petitioner's conviction, and a request for appointment of counsel, should the petitioner seek appointment. (§ 1172.6, subd. (b)(1).)

Subdivision (c) of section 1172.6 provides: "Within 60 days after service of a petition that meets the requirements set forth in subdivision (b), the prosecutor shall file and serve a response.

The petitioner may file and serve a reply within 30 days after the prosecutor's response is served. These deadlines shall be extended for good cause. After the parties have had an opportunity to submit briefings, the court shall hold a hearing to determine whether the petitioner has made a prima facie case for relief. If the petitioner makes a prima facie showing that the petitioner is entitled to relief, the court shall issue an order to show cause. If the court declines to make an order to show cause, it shall provide a statement fully setting forth its reasons for doing so."

If the trial court determines the petitioner has made a prima facie showing for relief and issues an order to show cause, the court must hold a hearing "to determine whether to vacate the murder [and] attempted murder . . . conviction[s] and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence." (§ 1172.6, subd. (d)(1).) At the hearing, the parties may rely on the record of conviction or present "new or additional evidence" to support their positions, and "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).)

## II. Analysis

As discussed in greater detail below, because the record demonstrates Smith is ineligible for relief as a matter of law on his first degree murder convictions, we reject his contention that the trial court erred by denying relief on those counts.

17

## A. Background

In 2017, Smith filed a capital habeas corpus petition in the California Supreme Court. In 2019, the Supreme Court transferred the matter to the trial court. The original trial judge was no longer on the court, so the matter was assigned to a different judge.

In 2020, the trial court requested supplemental briefing addressing whether SB 1437 affected Smith's second degree murder convictions. Smith filed a pro se section 1172.6 petition requesting appointment of counsel. Smith's attorney later filed a supplemental petition for resentencing. In the supplemental petition, counsel argued Smith was eligible for relief on his second degree and first degree murder convictions. In its response, the prosecution conceded Smith had made a prima facie showing for relief on the second degree murder convictions and agreed that on those counts, the court should issue an order to show cause and hold an evidentiary hearing. The prosecution argued that, with respect to the first degree murder counts, the record demonstrated as a matter of law that Smith was convicted under the theory that he harbored the intent to kill.

In 2021, the trial court issued an order to show cause why relief should not be granted on the second degree murder convictions. Later, after the passage of SB 775, the trial court granted Smith's request to include a challenge to his attempted murder conviction in his resentencing petition.

At the outset of the evidentiary hearing, held in 2022, the trial court stated:

> I did issue an order to show cause in this matter back in the day, a little bit before some of the law was clarified.

18

I thought that based on my reading of the record that the order to show cause would only apply to counts one and two [the second degree murder counts] and then with the changes in the law count five [the attempted murder count] as well.

I'm not sure that the law allows at this point the excising out of counts two and three or three and four, but we can deal with that I suppose.[5]

The evidentiary hearing focused solely on the second degree murder and attempted murder convictions. During argument, defense counsel suggested Smith's first degree murder convictions did not fall within SB 1437. The trial court responded:

I think everything's the subject of the 1437 petition. At this point I don't know the way they attach it allows me to parse it out that way, but I think in terms of whether there's going to be relief granted that there's not going to be relief to those two counts.

Defense counsel stated, "Okay. And that says it better. I don't want to unduly submit on something." He then clarified: "For the record, I'll say I'm contesting all of the counts under [SB] 1437 but the emphasis of my argument is the [second degree] [ ] murders [ ] and the attempted murder."

The trial court later issued a written order granting relief on the second degree murder and attempted murder convictions

---

5    It appears the trial court was unsure whether, because it was proceeding to an evidentiary hearing on some of the counts, it was therefore required to proceed to an evidentiary hearing on all counts.

but denying relief on the first degree murder convictions. The court addressed the first degree murder convictions in a footnote, stating:

> [ ] Smith's legal liability for the first degree murders of Andre Armstrong and James Brown, as alleged in Counts Three and Four, is not in issue here. The parties agree on this.

> The evidence is overwhelming that Smith had acted as "muscle" for the Bryant "Family" in the past, that he was present and joined in the backroom meeting where the shootings of those two men were presumably discussed and planned and had had numerous communications with codefendant Bryant during the days leading up to the murders and the period shortly after the murders. Whether [ ] Smith personally fired any of the fatal shots is debatable but there is no question that as at least an actual aider and abettor to those murders he knew of the crimes that codefendants Bryant and Wheeler intended to commit, was aware of their murderous intent, and assisted in the commission of those crimes. (*People v. McCoy* (2001) 25 Cal.4[th] 1111, 1117.) As a direct aider and abettor, he is criminally liable for the acts for which each of those elements is present. (Pen. Code § 31, *People v. Bryant, Smith and Wheeler*, *supra* 60 Cal.4[th] 335, 433-434.) Those acts clearly encompass [ ] the murders of Armstrong and Brown. The jury so found in convicting [ ] Smith of first degree willful, deliberate, and premeditated murders as to those victims. Derivative liability

20

based on direct aiding and abetting survived the changes in the law resulting from 2018 Senate Bill 1437 and 2021 Senate Bill 775 because it maintains the requirement that the defendant personally harbor the mental state of malice aforethought. (*People v. Nguyen* (2020) 53 Cal.App.5[th] 1154, 1164; *People v. Offley* (2020) 48 Cal.App.5[th] 588, 596.) [ ] Smith appears to agree with this analysis and conceded that an order to show cause should only be issued on the second degree murder counts (Counts One and Two) and the attempted murder count, Count Five.[6]

The same day the court issued its written order resolving Smith's petition, the court also issued a limited order to show cause why Smith's habeas corpus petition to recall and vacate his death sentence on the first degree murder counts (counts three and four) should not be granted and a new sentencing hearing ordered, including a new penalty phase trial should the prosecution decide to seek the death penalty.

The hearing on the order to show cause was held on March 24, 2022. The prosecution agreed that the trial court had the authority to recall and vacate the remaining death sentences and resentence Smith on the first degree murder convictions. The court vacated the judgment of death on those convictions, and the prosecution elected not to retry the penalty phase. The court set a sentencing hearing at which the only issues would be whether

---

6      At later hearings, Smith's attorneys challenged the trial court's statement that this issue had been conceded, and clarified for the record they believed Smith was eligible for relief on all counts.

21

the life sentences on the first degree murder convictions would be with or without the possibility of parole and whether the sentences would run concurrently or consecutively.

In April 2022, the court sentenced Smith to consecutive terms of life without the possibility of parole. In May 2022, the court denied the guilt phase claims in Smith's petition for writ of habeas corpus and dismissed the penalty phase claims as moot.

### B. Analysis

Smith argues the trial court erred by concluding he was ineligible for relief as a matter of law on the first degree murder convictions, and contends the case must be remanded for an evidentiary hearing on one of those counts (count four). We are not persuaded.

It is true, as Smith points out, that the jury was instructed on the natural and probable consequences doctrine. First, the court instructed the jury on aiding and abetting liability using CALJIC No. 3.01. That instruction stated, in pertinent part:

> A person aids and abets the [commission] [or] [attempted commission] of a crime when he or she,
> (1) with knowledge of the unlawful purpose of the perpetrator and
> (2) with the intent or purpose of committing, encouraging, or facilitating the commission of the crime, by act or advice aids, promotes, encourages or instigates the commission of the crime.

Then, in addition to instructing the jury on actual malice murder, the court instructed the jury on the natural and probable consequences doctrine using CALJIC No. 3.02. That instruction provided:

22

> One who aids and abets another in the commission of a crime or crimes is not only guilty of that crime, or those crimes, but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crime or crimes originally aided and abetted.
>
> In order to find a defendant guilty of a crime under this theory, you must be satisfied beyond a reasonable doubt that:
>> 1. The crime of murder was committed
>> 2. The defendant aided and abetted such murder,
>> 3. Thereafter, a co-principal in such crime committed additional charged murders, and
>> 4. Those additional murders were a natural and probable consequence of the commission of the murder or murders which the defendant initially aided and abetted.

Smith argues that, because the jury was instructed on the natural and probable consequences doctrine, it is possible the jury convicted him of the murder of James Brown under this imputed-malice theory, and consequently, the record does not demonstrate ineligibility as a matter of law on count four.

Although it is theoretically true these instructions left open the possibility that the jury could convict Smith on count four under the natural and probable consequences doctrine, the record, viewed as a whole, demonstrates Smith is ineligible for relief as a matter of law on that count. A review of closing arguments reveals that, in regard to the murder of Brown, the prosecution did not argue Smith was guilty under the natural and probable consequences doctrine. Rather, the prosecution's

sole theory concerning the murder of Brown was that Smith harbored the express intent to kill. The prosecution summarized its theory as follows: "[Y]ou have Don Smith, Johnny Settle, Leroy Wheeler and Stan Bryant going in the back room of that house, going back there and planning what is to occur, bringing guns to the crime scene and bringing gloves to the crime scene, laying out a plan to lure Andre Armstrong and James Brown over there to kill them . . . ." The prosecution's closing argument thus makes clear that the only theory of murder liability it presented to the jury was that Smith harbored the express intent to kill Brown. Because this was the only theory presented to the jury, the jury necessarily convicted Smith on that theory, not under the natural and probable consequences doctrine. In other words, the record demonstrates the jury found Smith guilty beyond a reasonable doubt of murdering Brown under current law. (See generally §§ 187, subd. (a), 188, subd. (a)(1) [express malice is a valid theory of murder liability under current law].) He is therefore ineligible for relief as a matter of law on count four.

Although Smith does not argue on appeal that he is entitled to an evidentiary hearing on count three (the murder of Armstrong), for purposes of clarity, we note that he is not entitled to an evidentiary hearing on that count for the same reason is he not entitled to one on count four – the record demonstrates the sole theory presented to the jury on both of those counts was that Smith was guilty of murder because he harbored the intent to kill. Additionally, because the record demonstrates Smith is ineligible for relief as a matter of law on counts three and four, we need not address his argument that the trial court engaged in improper factfinding on those counts.

24

Lastly, we have considered the Supreme Court's recent decision in *People v. Curiel* (2023) 15 Cal.5th 433 (*Curiel*) and how it might impact Smith's case. Nothing about *Curiel* alters our conclusion that, here, the record demonstrates Smith is ineligible for relief as a matter of law on counts three and four. Whereas the prosecution in *Curiel* argued to the jury that Curiel was guilty of murder under the natural and probable consequences doctrine (*id.* at p. 445), here, as explained above, the sole theory the prosecution presented to the jury on counts three and four was that Smith was guilty of murder because he harbored the intent to kill. Because the jury convicted Smith on counts three and four under this theory, not under the natural and probable consequences doctrine, Smith is ineligible for relief as a matter of law on those counts. *Curiel* is therefore of no assistance to Smith.

## DISPOSITION

The order denying Smith section 1172.6 relief on his first degree murder convictions is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

CURREY, P. J.

We concur:

COLLINS, J.

MORI, J.